OPINION OF THE COURT
Daniel D. Leddy, Jr., J.
In this proceeding to adjudicate the respondent to be a person in need of supervision (PINS) the court is called upon to construe the provisions of subdivision (b) of section 716 of the Family Court Act concerning substitution of petitions. The issue is presented as a result of a motion by the Law Guardian, at the conclusion of the fact-finding hearing, to substitute a finding of neglect for the instant PINS petition.
The present petition, filed by the boy’s natural father, alleges that the respondent is a person in need of supervision in that he “threatened petitioner’s wife with a knife on June 16, 1980 at about 8:30 p.m. Respondent refuses to obey the just and reasonable commands of his step-mother at times.” After listening to the testimony adduced at the *976 hearing, the court finds that the following facts have been established beyond a reasonable doubt.
The respondent was born on November 26, 1966 and resided with his parents until their divorce. Thereafter, custody was given to the natural mother with the father obtaining visitation rights which he exercised regularly. When the father remarried, his new wife was thoroughly antagonistic to Leif, making it clear to the boy that he was not welcome in her home, even for brief visitation periods with his father. This attitude on her part was unprovoked.
Unfortunately, the boy’s natural mother became increasingly ill and was eventually unable to care for him any longer. Leif was sent to live with his father and stepmother during the Columbus Day weekend of 1979. Tragically, Leif’s mother passed away in December of that year.
When the boy’s initial stay at his father’s home proved difficult, he was sent to live with a sister and then an aunt. Eventually, however, he returned to his father in June of this year.
During her testimony, the stepmother admitted that she had no love for Leif and had told him so. She further made it clear to the boy that he was not welcome in the home but was living there only as an accommodation to his father. She made remarks such as “Get this fucking kid out of the house”, and even taunted her husband to choose between his son and her.
For his part, the boy was given a 9:00 p.m. curfew which he obeyed regularly. He liked to sing and play his guitar but his stepmother made him stop, telling him that he sounded like a dead cow.
The stepmother repeatedly faulted the boy for failing to put away his personal belongings, and keep his room in order. On one occasion, following an argument, she jumped on his back, knocking the youngster to the ground. Leif weighs only 77 pounds while his stepmother weighs at least twice that amount.
On June 16, 1980, when Leif returned home from a friend’s house, his stepmother warned him to stop making certain noises with his mouth. A shouting match ensued dur *977 ing which she called his dead mother a “whore”. The youngster broke down in tears, grabbing a knife. He did not, however, make any overt move toward his stepmother and was willingly disarmed by his father. After the police were called and the situation calmed, Leif spoke quietly of his behavior, indicating that he had been upset at the cruel charge made against his deceased mother. Incredibly, his stepmother once again repeated her assertion that the boy’s mother was a “whore” and when Leif protested, she commented that the boy wasn’t old enough to know the difference.
The boy’s father severely reprimanded his wife for her remarks and accompanied his son to a motel to spend the night. His father acknowledged that Leif had been hurt many times by his stepmother’s actions. He noted that the boy rarely cries but that he was brought to tears by the vicious attack on his dead mother.
Based on the foregoing, any suggestion that Leif is “incorrigible, ungovernable or habitually disobedient” (Family Ct Act, § 712, subd [b]) shocks the conscience. It is crystal clear that this vulnerable little child has himself been subjected to an unabated course of cruel, emotional torment. Indeed, the record of this proceeding fully supports a finding that Leif is a neglected child within the meaning of subdivision (f ) of section 1012 of the Family Court Act.
The Law Guardian’s motion to substitute a neglect finding merely asks the court to acknowledge what is apparent on the face of the record. On the other hand, it is urged that section 716 of the Family Court Act merely authorizes the substitution of a new petition, alleging neglect, on which the named respondent is entitled to fact finding de nova.
The relevant section of the Family Court Act provides as follows:
“§ 716. Substitution of petition
“(a) On its own motion and at any time in the proceedings, the court may substitute for a petition to determine delinquency a petition to determine whether a person is in need of supervision.
“(b) On its own motion and at any time in the proceed *978 ings, the court may substitute a neglect petition under article three of this act for a petition to determine delinquency or for a petition to determine whether a person is in need of supervision.”
It should be noted at the outset that article 3 of the Family Court Act has been repealed with the subject matter being now covered in article 10. Failure of the Legislature to conform the language of section 716 to reflect the repeal of article 3 is of no legal consequence.
In analyzing section 716, it is noted that the Legislature utilized the infinitive “to determine” when referring to the substitution of a PINS petition for a delinquency petition. It might well be argued, therefore, that the Legislature intended to require the filing of a new pleading and fact finding thereon where such a substitution is effected. (See and contrast Matter of Bordone v Allen F., 33 AD2d 890; Matter of Carter v Family Ct. of State of N. Y., 22 AD2d 888.)
However, in treating the substitution of a neglect proceeding, the Legislature did not employ the infinitive form. Thus, the statute merely refers to the substitution of a “neglect petition” and not a petition “to determine whether a child is neglected”. The use and nonuse of the infinitive is important in viewing statutory intent since “In the construction of a statute, meaning and effect should be given to all its language, if possible, and words are not to be rejected as superfluous when it is practicable to give to each a distinct and separate meaning.” (McKinney’s Cons Laws of NY, Book 1, Statutes, § 231; see, also, People v Dethloff, 283 NY 309, 315.)
Both PINS proceedings and neglect proceedings purport to deal with the realities of a child in trouble. It is often difficult to delineate clearly whether the source of that trouble is properly within the PINS statute or the neglect statute. For where there is a crisis in the life of a child requiring court intervention, the indicia of both statutes are often present and may, indeed, overlap. The ultimate determination may depend more upon the social mores of the time than upon the dictates of clearly defined criteria. The Joint Legr islative Committee on Court Reorganization recognized the *979 possible interrelationship of these statutory considerations in shaping section 716. (See Report of Joint Legislative Committee on Court Reorganization, Family Court Act, McKinney’s 1962 Session Laws of NY, pp 3428, 3441.)
Where a parent files a PINS petition, he chooses to air the problems of the child and the home in a judicial forum. He further consents to court jurisdiction over the parent-child relationship, the exercise of which could ultimately result in placement. (Family Ct Act, § 754.) If, during the course of the fact-finding hearing, it develops that the problem is properly one of neglect, there is no reason for the court to close its eyes to that fact or to avoid labeling it as such. A de nova fact-finding hearing is not required under article 10 of the Family Court Act.
In fact, the procedures set forth in article 10 are specifically designed “to provide a due process of law for determining when the state, through its family court, may intervene against the wishes of a parent on behalf of a child so that his needs are properly met.” (Family Ct Act, § 1011.) Thus, when a parent invokes court jurisdiction and intervention in the first instance, the fact-finding procedures set forth in article 10 are no longer operative.
The decision of the Court of Appeals in Matter of Ella B. (30 NY2d 352) does not dictate a contrary result. In Ella B., the court held that an indigent respondent in a neglect proceeding must be advised of his right to be represented by assigned counsel. The basis of the court’s ruling (supra, p 356) was a recognition that “A parent’s concern for the liberty of the child, as well as for his care and control, involves too fundamental an interest and right * * * to be relinquished to the State without the opportunity for a hearing, with assigned counsel if the parent lacks the means to retain a lawyer.”
In this case, the petitioner has already consented to State intervention in the parent-child relationship by the very filing of the PINS petition. Thus, the underlying rationale of Ella B. does not apply.
The court is aware that a certain stigma may attach to a parent whose child has been neglected by him. However, the thrust of an article 10 proceeding is to assess the status of *980 the child and not to label the parent. Thus, section 1012 of the Family Court Act defines a “neglected child” and not a “neglectful parent”.
Similarly, a respondent parent cannot lose his liberty as a result of an article 10 proceeding per se. Should there be a consequent criminal action initiated in another forum, the parent would be entitled to the full panoply of protection accorded an accused. (Matter of Fred S., 66 Misc 2d 683.)
By way of comparison, a child adjudged to be in need of supervision not only suffers the stigma of being branded “incorrigible, ungovernable or habitually disobedient” but. also faces the prospect of placement.
It is for this reason that a PINS finding must be established beyond a reasonable doubt. (Matter of Iris R., 33 NY2d 987; Matter of Richard S., 27 NY2d 802; Matter of Winship, 397 US 358.)
If parents were the legislative target of article 10 proceedings as children are in PINS proceedings, the reasonable doubt standard would similarly be required. Such is simply not the case and the appropriate burden of proof remains a preponderance of the evidence. (Family Ct Act, § 1046, subd [b].)
In this case, the respondent’s father and stepmother voluntarily sought court intervention, thereby subjecting the problems of their home to judicial scrutiny. Although the petitioner is the boy’s natural father, it is clear that the prime mover is the stepmother. A full adversarial hearing was held at which the petition was presented by the Corporation Counsel. As a result of that hearing, the court has identified the problem in the home as being the fact that Leif is a neglected child. And this finding is made beyond a reasonable doubt despite the fact that a mere preponderance of the evidence would suffice.
Consistent with its parens patriae function, this court will act decisively to assist the child, the first step of which is the recognition of his status. It is difficult enough to discover the plight of a suffering child without suggesting that the Family Court turn away when confronted with overt neglect. The present PINS petition is a transparent sham, *981 the final act of cruelty directed against a defenseless little boy.
Accordingly, the motion of the Law Guardian is granted. A neglect finding is substituted and Leif is adjudged to be a neglected child in that his physical, mental and emotional condition has been impaired as a result of the failure of his stepmother to exercise a minimum degree of care in providing him with proper supervision and guardianship. (Family Ct Act, § 1012.)