*938 OPINION OF THE COURT
Daniel D. Leddy, Jr., J.
In dismissing the instant person in need of supervision (PINS) proceeding this court holds that 13-year-old Andrew R. was legally justified in resisting his parents’ efforts to return him to foster care against his will. Reaching this decision, the court concludes that his placement at Hawthorne Cedar Knolls (Hawthorne) for over seven months under a so-called voluntary placement without any review by a neutral fact finder violated his fundamental liberty interest as protected by the due process clause of the Fourteenth Amendment to the United States Constitution.
Andrew is an intelligent, appealing boy who desperately wishes to remain at home on Staten Island. His parents are equally determined to return him to Hawthorne, a residential treatment center, to which he had been sent by them under a so-called voluntary placement instrument. (Social Services Law, § 384-a.) The parent-child conflict culminated in the instant PINS proceeding.
Thus, on August 16, 1982, Andrew’s father filed a petition with this court alleging that his son was a person in need of supervision (PINS) in that “he is beyond the lawful control of his parents. Respondent on this date, threatened petitioner with a knife and damaged household property. Respondent had been voluntarily placed with Hawthorne Cedar Knolls from January, 1982 up until about a week ago, at which time he ran away and returned home.”
The petition was subsequently amended to add an additional allegation that “Respondent truanted from school for over two years and truanted while in placement.”
A fact-finding hearing was held during which the only witnesses were Andrew and his father. During the hearing, the Assistant Corporation Counsel, representing the petitioner father, attempted to elicit testimony about additional alleged misbehavior on the part of Andrew other than that specifically set forth in the petition. In offering this testimony, the petitioner argued that it was sufficiently pleaded under the umbrella allegation that Andrew “is beyond the lawful control of his parents”. The court *939 sustained the Law Guardian’s objection as a matter of both statutory law and constitutional due process.
Subdivision (a) of section 732 of the Family Court Act provides that a PINS proceeding is initiated by the filing of a petition, alleging that “the respondent is an habitual truant or is incorrigible, ungovernable, or habitually disobedient and beyond the lawful control of his parents * * * and specifying the acts on which the allegations are based and the time and place they allegedly occurred” (emphasis supplied).
This statutory provision evidences clear legislative intent to accord a PINS respondent adequate notice of the charges. It is consistent with long-standing judicial recognition that a PINS proceeding is quasi-criminal in nature, involving the potential for significant governmental interference in the liberty of the child (Family Ct Act, §§ 754, 756). Therefore, the due process rights accorded to a respondent in a juvenile delinquency proceeding apply with equal force to a PINS respondent. (Matter of Cecilia R., 36 NY2d 317; Matter of Iris R., 33 NY2d 987; Matter of Theodore F., 47 AD2d 945; Matter of Reynaldo R., 73 Misc 2d 390; Matter of George C., 91 Misc 2d 875.)
For these reasons, a general allegation that a respondent is beyond the lawful control of his parents may not be utilized as a predicate to subject the child’s life to parental attack.
As was stated in Matter of Reynaldo R. {supra, p 394) “no petition alleging a person to be in need of supervision can stand unless the acts complained of are set forth in specific terms with dates and frequency, the nature of the behavior and conduct charged * * * Otherwise, there is a violation of child’s constitutional rights to notice of charges against him in time to prepare for trial, not at the time of trial. None of these rights can be taken away from children merely because their conduct is noncriminal or the subject of a PINS petition. (Matter of Gault, 387 U. S. 1)”. (See, also, Cole v Arkansas, 333 US 196; People v Zambounis, 251 NY 94, 96; People v Fletcher Gravel Co., 82 Misc 2d 22.)
In January of 1982, while under the so-called “voluntary placement” Andrew was sent to Hawthorne, a residential treatment center in Hawthorne, New York. At the hear *940 ing, the petitioner father testified that his son agreed to the placement at Hawthorne. Andrew disputed this, maintaining that he never wanted to leave home and that, in effect, he was tricked into going by a promise from his father that his stay would be no longer, than a month. The court believes Andrew and concudes that he was induced to go to Hawthorne by a representation that was at least misleading, if not purposely false.
In August of this year, the respondent ran away from Hawthorne and returned home, refusing to return. When pressed by his father to go back to the facility, Andrew reacted with threats against him. On one occasion, he threatened to kill his father. In response thereto, his father handed him a knife and told him to go ahead and do it. Andrew thereupon proceeded to thrust the knife into a household item.
While in school at Hawthorne, the respondent cut a number of classes, although he attended his academic subjects for the most part.
Hawthorne is anxious to have Andrew return, since it believes that he can be helped by their program. In fact, it was at the urging of Hawthorne personnel that the petitioner initiated this proceeding. It has been apparent at the outset that the petitioner is utilizing the PINS procedure to compel his son’s return to Hawthorne.
Stripped of all euphemism, the term “voluntary placement” is dangerously misleading. A review of section 384-a of the Social Services Law reveals that the child is not a party to the instrument effecting the foster care placement. Nor is there a requirement that the wishes of the child be considered or even solicited.
It is readily evident, therefore, that there is no reason to assume that any “voluntary placement” is truly voluntary on the part of the child.
This is significant since, in this case, there can be no doubt that Andrew’s placement at Hawthorne against his will involves a substantial deprivation of liberty.[2] The language of Matter of Gault (387 US 1, 27, supra) is *941 appropriate “His world becomes ‘a building with whitewashed walls, regimented routine and institutional hours ..Instead of mother and father and sisters and brothers and friends and classmates, his world is peopled by guards, custodians * * * and ‘delinquents’ ”.[3]
The deprivation of liberty extends beyond the mere fact of confinement in a residential treatment center. A child so placed loses the daily consortium of family and friends, schoolmates, and participation in community affairs and activities.
In his concurring and dissenting opinion in Parham v J.R. (442 US 584, 626), Mr. Justice Brennan referred to commitment to a mental institution as involving a “ ‘massive curtailment of liberty’” since it restricts not only physical liberty but also contacts with “friends, family and community”.
Andrew’s liberty interest has been further impaired by the fact that he has been sent to a facility that contains both juvenile delinquents and PINS, children who are entitled to treatment measured by their need for rehabilitation. (Matter of Lavette M., 35 NY2d 136.) Thus, where there is a commingling of voluntarily placed children, PINS, and juvenile delinquents, it may well be that the “basic care” to which a foster child is entitled is in jeopardy.
It is more than ironic that Andrew arrived at Hawthorne by a process that accorded him absolutely no legal rights while others, with whom he came into daily contact, enjoyed all of the procedural and substantive protection that apply to PINS and juvenile delinquency cases.[4] At least in this case, the problem created by this disparity in treatment reaches constitutional dimensions.
New York has virtually ignored the feelings of children who are placed in foster care against their will. Section 358-a of the Social Services Law provides for judicial *942 approval of a voluntary placement instrument in any instance where the child is likely to remain in foster care for in excess of 30 consecutive days. The statute requires that the review proceeding be filed “as soon as practicable, but in no event later than thirty days following removal of the child from the home”. (Social Services Law, § 358-a, subd [1].) This should be contrasted with a PINS proceeding where a child is entitled to a probable cause hearing within three days of any remand to a foster care facility (Family Ct Act, § 739, subd [b]). What is critically important, however, is that while section 358-a of the Social Services Law mandates the filing of a petition within 30 days of the removal from home, there is no statutory time limitation within which the court proceeding must take place. And in Andrew’s case, a review of the records of the Family Court foster care review term in Manhattan reveals that no petition has yet been filed to review the voluntary placement instrument which is now over seven months old.[5]
It is apparent that the protection accorded to a child under section 358-a is anywhere from minimal to nonexistent. This is consistent with a finding that the statute is, in reality, a “funding device to trigger the flow of Federal dollars” and that the issue at a hearing thereunder is “the voluntariness of a parent’s transfer of custody, not whether a placement by the State is in the child’s best interests”. (Sinhogar v Parry, 53 NY2d 424, 446 [Fuchsberg, J., dissenting].)
To reach a decision in this case, the court need not consider whether New York’s statutory scheme for effecting voluntary placements violates the child’s right to due process of law. The holding herein must be limited to the facts of this case. Thus, the issue is whether Andrew R, an intelligent youngster, “mature enough to have [his contrary] desire respected” (Wisconsin v Yoder, 406 US 205, 242) suffered a constitutionally infirm deprivation of lib *943 erty by being kept in foster care at Hawthorne against his will for over seven months without any hearing or other review by a neutral fact finder. The issue is thus framed since it is fundamental that a child may not be adjudicated a PINS for refusing to comply with a directive that violates his constitutional rights or is otherwise unlawful. (Matter of Mary P., 111 Misc 2d 532.)
This court is well aware that parents have a fundamental right to raise their children and that their discretion in that regard must be protected against unreasonable intrusion by the State. (Pierce v Society of Sisters, 268 US 510; Meyer v Nebraska, 262 US 390; Wisconsin v Yoder, 406 US 205, supra.)
At the same time, it is equally true that “Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are protected by the Constitution and possess constitutional rights.” (Planned Parenthood of Missouri v Danforth, 428 US 52, 74.)
With this rationale, it has been held that the concept of liberty protected by the due process clause of the Fourteenth Amendment precludes any absolute parental right to be consulted about, much less veto, their child’s desire to have an abortion. (Planned Parenthood of Missouri v Danforth, supra; Bellotti v Baird, 443 US 622.)
The State’s legitimate concern for the welfare of children forms the basis for intervention in the parent-child relationship in instances of neglect or abuse. (Family Ct Act, §1011.)
Similarly, custody of a child may be awarded to a non-parent as opposed to a parent where there is parental unfitness or extraordinary circumstances. (Matter of Bennett v Jeffreys, 40 NY2d 543.)
In Sinhogar v Parry {supra), the Court of Appeals considered the constitutional rights of children who have already left the natural family setting when there is a subsequent transfer from foster care within the State to foster care in an out-of-State institution. In holding that there is no constitutional right to notice or a hearing prior to such transfer, the court noted that immediately upon such *944 transfer “ ‘[a]ny person aggrieved by such decision’ ” may be heard at a fair hearing. (Sinhogar v Parry, supra, at p 435; Social Services Law, § 400, subd 2.) Thereafter, further review may be had pursuant to CPLR article 78.
It seems patently unreasonable that a placement from one foster care setting to another should be endowed with greater ceremony than the initial placement into foster care. For a child like Andrew, the first separation from family, friends and community is more than likely to be the most traumatic.
In Parham v J.R. (supra), the United States Supreme Court held that a child has a substantial liberty interest in not being confined unnecessarily for medical treatment. Accordingly, “the risk of error inherent in the parental decision to have a child institutionalized for mental health care is sufficiently great that some kind of inquiry should be made by a ‘neutral factfinder’ to determine whether the statutory requirements for admission are satisfied * * * That inquiry must carefully probe the child’s background using all available sources, including, but not limited to, parents, schools, and other social agencies. Of course, the review must also include an interview with the child. It is necessary that the decisionmaker have the authority to refuse to admit any child who does not satisfy the medical standards for admission.” (442 US 584, 606-607, supra.)
As has already been established, Andrew has a liberty interest that suffers substantial infringement by his placement at Hawthorne against his will. For the purposes of this decision, however, it is not necessary to decide whether due process required a formal hearing either before Andrew was placed in foster care or even immediately thereafter.
Given the posture of the case, the court need only decide whether his running away from Hawthorne in August and his refusal to return constitutes PINS behavior. The court concludes that it does not and finds that the failure to afford Andrew any review of his foster care placement by a neutral fact finder for over seven months violated his constitutional right to due process of law.
It must follow, therefore, that the boy may not be penalized in any manner whatsoever for running away and *945 staying away from Hawthorne. For the same reasons, his failure to co-operate with the school program at Hawthorne may not subject him to the stigma of a PINS finding.
The court is aware that Andrew made threats against his father as a result of his placement at Hawthorne and in response to his father’s desire to implement that placement. And it must be emphasized that this court in no way condones this behavior on Andrew’s part. Neverthéless, those threats (and they remained just that) must be evaluated against all the facts in this case. An intelligent, sensitive youngster is placed against his will in a facility that houses juvenile delinquents and PINS and is denied review of that parental decision for over seven months. He lacks the resources to challenge the placement through legal means and resorts to threats to enunciate his liberty interest. On the facts of this case, those threats are more attributable to the failure of the State to provide the boy with an opportunity to be heard rather than PINS intent on his part. (See Matter of Price, 94 Misc 2d 345; Matter of Reynaldo R., supra; Ossant v Millard, 72 Misc 2d 384.)
Furthermore, in handing Andrew a knife at a time when the boy threatened to kill him, the petitioner demonstrated remarkably poor judgment. The inappropriate nature of this behavior on the part of the petitioner is exceeded only by his temerity in charging the boy with threatening him with a knife. “A parent in a PINS petition has no divine right to be right. Their actions and conduct must be more carefully screened than those of the accused child.” (Matter of Reynaldo R., supra, at p 394.)
While at Hawthorne, Andrew’s attendance at school was less than exemplary. He cut several classes a week even though there is no evidence to controvert his assertion that he was present for his academic subjects. Nevertheless, Andrew’s failure to attend school while at Hawthorne must be viewed in the same light as his refusal to stay at that facility. His truancy was simply another manifestation of his deep-seated desire not to be at Hawthorne, a desire that was never evaluated in a manner consistent with constitutional due process.
Accordingly, the court cannot find that Andrew had the requisite intent to truant from school or to disobey the *946 mandates of article 65 of the Education Law. (See Ossant v Millard, supra.)
The court also finds that the petitioner has failed to establish beyond a reasonable doubt that Andrew was sufficiently truant from school prior to placement in order to sustain a finding that he is “incorrigible, ungovernable or habitually disobedient and beyond the lawful control” of his parents. (Family Ct Act, § 712, subd [b].) In that regard, it should be noted that the petitioner chose not to allege specifically a violation of article 65 of the Education Law, preferring instead, to make the allegation of truancy following the assertion that Andrew “is beyond the lawful control of his parents”.
Section 3233 of the Education Law makes absence from school for even one day a violation and provides a stated penalty. However, even if measured by the dictates of article 65 of the Education Law, Andrew’s sporadic absences prior to placement cannot support a PINS finding. To interpret article 65 as justifying State interference in the parent-child relationship as a result of a few absences from school would render the statute unconstitutional as an arbitrary and unreasonable interference in the affairs of both parent and child. (Parham v J.R., supra; Wisconsin v Yoder, supra.)
In order to sustain a PINS finding on the basis of truancy, there must be a substantial and intentional failure to attend school.[6] Such has not been established here.
For all of the foregoing reasons, the petition is dismissed. Furthermore, incidental to the order of dismissal and at the request of the Law Guardian, a final order of protection is issued to the child directing the petitioner to cease and desist in his efforts to have Andrew return to Hawthorne under the instant voluntary placement instrument. Since his continued placement there offends his constitutionally protected liberty interests, any attempt by the parents to force his return against his will is conduct that is “offensive” to the child within the meaning of subdivision (c) of section 759 of the Family Court Act. (See *947 Matter of Mary P., supra.) The petitioner is warned that any violation of the order of protection may result in a six-month jail term. (Family Ct Act, § 780.)
The court notes with disapproval that the instant PINS petition was filed at the suggestion of Hawthorne. Where a child is placed at a residential treatment center under a so-called voluntary placement, it is hardly appropriate for that facility to suggest the filing of a PINS petition because of behavior that presumably led to his being there in the first place. The function of such facilities is to treat such behavior, not complain about it.
The court is aware that Andrew is presently residing at a group home on Staten Island. Providing that the boy is in accord, nothing in this decision militates against his remaining at that facility under a new voluntary placement instrument.
The adjourned date of November 8, 1982 is vacated and the respondent is released from remand forthwith.
Finally, the court feels constrained to point out that, once again, the plight of an innocent child has come to light, by accident, solely because of . the filing of a PINS petition. (See, also, Matter of Leif Z., 105 Misc 2d 973; Matter of Ian D., 109 Misc 2d 18.)
This is a sad commentary on the degree of our society’s commitment to treating children with the respect they deserve as citizens. This case demonstrates in graphic terms the need to avoid granting to agencies unfettered discretion over the liberties of children, something that is certain to occur if, as some would have it, PINS cases are removed from the jurisdiction of the Family Court.

. The court concedes that Hawthorne enjoys a fine reputation for helping young people. Whether it is an appropriate place for Andrew is not before the court.

. Hawthorne Cedar Knolls accepts children on voluntary placement as well as persons in need of supervision (PINS) and juvenile delinquents.

. These include, inter alia, the right to counsel, to adequate notice of the charges, to confront and cross-examine witnesses, to the exercise of the privilege against self incrimination, and to have the stated charges proven beyond a reasonable doubt.

. After decision was reserved in this case, the court initiated a search of the records of the foster care review term and determined that a petition to approve Andrew’s placement had not yet been filed. This is in accord with the well-established principle that a court may take judicial notice of its own records. (Matter of Ordway, 196 NY 95.) To assure fairness, both the Assistant Corporation Counsel and the Law Guardian were so informed. (See Richardson, Evidence [10th ed], § 14, p 9.)

. The court stops short of holding that the truancy must be “habitual” as required by the original version of subdivision (b) of section 712 of the Family Court Act. (See, also, People v Pikunas, 260 NY 72.)