OPINION OF THE COURT
Daniel D. Leddy, Jr., J.
On September 18, 1985, the parents of 13-year-old Sammy P. (Sam) signed an instrument transferring the care and custody of their son to the Commissioner of Social Services of the City of New York (Commissioner), pursuant to Social Services Law § 384-a. Under the provisions of Social Services Law § 358-a (1) (b), the Commissioner was thereafter required *70 to initiate a proceeding seeking judicial approval of the instrument by filing a petition for that purpose "in no event later than thirty days following removal of the child from the home”. However, the petition was not filed with the court until the afternoon of October 23, 1985, five days late. Where a petition is not timely filed, the court must still "receive, hear and determine” the matter "but state reimbursement to social services district for care and maintenance provided to such child shall be denied” (Social Services Law § 358-a [1] [b]).
After inquiry, the court was satisfied that the instrument was executed by the parents "knowingly and voluntarily and because * * * they would be unable to make adequate provision for the care, maintenance and supervision” of Sam in their home. (Social Services Law § 358-a [3] [a].) The court also found that Sam’s best interest would be furthered by his removal from his parents’ home. The issue now before the court involves the interpretation of a recent amendment to Social Services Law § 358-a which provides, inter alia, that the order granting the petition "may include conditions, where appropriate and specified by the judge, requiring the implementation of a specific plan of action by the social services official to exercise diligent efforts toward the discharge of the child from care, either to his own family or to an adoptive home”. (Social Services Law § 358-a [3] [b].)
The specific question raised is the scope of the court’s authority under this new statutory provision.
The court spoke to Sam in camera in the presence of his Law Guardian. He impressed the court as a very intelligent, sensitive youngster who was going through an especially difficult time of his life. Sam told the court that he was miserable at Pleasantville Cottage School, a residential treatment center operated by the Jewish Child Care Association of New York (Agency). This court has interviewed hundreds and, perhaps, thousands of children in foster care settings and has yet to encounter a child who seemed more depressed over his plight than Sam. He seemed particularly ill at ease with the other residents of the facility. In an effort to determine whether its order granting the petition should include "conditions * * * requiring the implementation of a specific plan of action by the social services official”, the court set the matter down for a hearing. The court indicated that in furtherance of the stated purpose of the hearing, it would consider testimony on the appropriateness of Sam’s continued placement at Pleasantville Cottage School.
*71 In the interim, the attorneys for the Agency moved, by order to show cause, for an order "dismissing the proposed proceeding to review the plan of treatment for [Sam] on the ground that the Court does not have jurisdiction of the subject matter of this proceeding.” The Law Guardian, representing Sam, asks the court to order his removal from Pleasantville. The Commissioner has taken the position that the court may hold a hearing "to inquire as to the agency’s diligent efforts to facilitate discharge of the child from foster care.” According to the Commissioner, the court may direct the level of care which a foster care child shall receive upon a specific finding, made after hearing, that such will facilitate discharge from foster care. At the same time, however, the Commissioner argues that the court lacks authority to direct the placement of a child in a specific facility.
Prior to its recent amendment, Social Services Law § 358-a conferred very limited jurisdiction on the Family Court in proceedings to approve voluntary placement instruments. As the Court of Appeals pointed out in Matter of Damon A. (61 NY2d 77, 81) "Once the petition was approved, the proceeding terminated and Family Court was without power to oversee the agency’s efforts”. A review of the amended section compels the conclusion that the Legislature, mindful of the holding in Damon A., intended to confer new, important, and substantial jurisdiction on the Family Court to protect the interests of children in voluntary foster care placements.
Laws of 1985 (ch 808, § 1), as enacted by the Legislature, recognizes that "voluntarily placed foster children and their families receive few of the procedural protections which apply to children placed into care pursuant to court order, although situations leading to placement are often very similar to those of court placed persons in need of supervision, abused or neglected children.” The Legislature further noted that the monitoring provided by the Child Welfare Reform Act (Social Services Law § 409 et seq.) assures only minimum standards of agency planning and performance and cannot substitute for the traditional role of the court performing its "case-by-case determinations of individual rights and interests that result from judicial review.” The Governor’s memorandum of approval dated August 2, 1985 notes that the "bill will enhance Family Court review of the voluntary placement of children in foster care * * * authorizes Family Court Judges to impose conditions upon social services official to ensure adequate care, and allows Family Courts to exercise continuing jurisdiction *72 over these cases prior to the expiration of eighteen months of foster care.” (1985 McKinney’s Session Laws of NY, at 3323.) Against this background, the court now turns to the language of the amended section.
The statute provides, inter alia, that the court order may include conditions "requiring the implementation of a specific plan of action by the social services official to exercise diligent efforts toward the discharge of the child from care, either to his own family or to an adoptive home”. (Social Services Law § 358-a [3] [b].) In permitting the court to require the implementation of a specific plan of action, the Legislature must have intended to place before the court for review the suitability of the facility at which the child is placed to meet the mandated permanency planning goals. If the level of care or treatment a child receives at a particular facility does not further the "discharge of the child from care”, it is not in accord with State policy, and may not be sanctioned. The agency in the instant case argues that it has absolute discretion to determine where Sam should be placed and that its decision in that regard is not subject to judicial review even under the amended statute. The court disagrees.
The court certainly agrees that foster care agencies must have wide discretion to deal with children placed in their care. Certainly, it is neither feasible nor desirable for the court to become a supervisor in the day-to-day operations of the agency. However, the foster placement at which a child resides is at the very heart of the treatment plan. It determines such things as the limitation on the child’s freedom, the type of children with whom he will live, and the level of care he will receive. It is probably the most important part of the "specific plan of action” to further the "discharge of the child from care”. Common sense, a plain reading of the statute, and its legislative history strongly suggest that the court has jurisdiction to consider whether the facility or place where a foster child resides furthers the child’s best interests and the express State policy requiring permanency planning.
In all cases, the position of foster care agencies should be accorded careful consideration and great weight, this in deference to their presumed expertise in the field. And, as a practical matter, the placement decision of the agency may well be left undisturbed in the great majority of the cases. There will be, however, those cases where the interests and rights of the child and policy of the State are not being furthered by placement of a child at a particular type of *73 facility. In such cases the court must intervene to effect a change of placement as part of a "specific plan of action * * * toward the discharge of the child from care”.
As has been noted, Sam impresses the court as an intelligent, sensitive child who is clearly miserable at Pleasantville. He stated in camera that the people at the facility "don’t act right”. The court is entitled to know whether Sam, a voluntary placed child, is receiving the proper care and treatment he requires at a facility that apparently houses juvenile delinquents, persons in need of supervision, and voluntary placed children. In Matter of Ellery C. (32 NY2d 588) the Court of Appeals held that persons in need of supervision may not properly be confined in institutions with juvenile delinquents since such would compromise their right to appropriate care and treatment. And in Matter of Lavette M. (35 NY2d 136) the State’s highest court emphasized that its holding in Ellery C. was predicated on the presence in the institutions of juvenile delinquents, "The main thrust of our holding in Ellery C. was that it is inconsistent with the statutory right to 'supervision’ and 'treatment’ to place PINS children in institutions in which juvenile delinquents are confined” (35 NY2d 136, 141, supra). While being a structured setting, Pleasant-ville is neither a prison nor training school. At the same time, it may well be that Sam’s contact with adjudicated persons in need of supervision and juvenile delinquents is having a deleterious effect on him that would inhibit rather than further his discharge from foster care. There is no question that Sam is miserable at Pleasantville. During the pendency of this case, he wrote a letter to the court urging the court to expedite its decision and effect his release from Pleasantville. The fact that this intelligent, articulate youngster is so unhappy in his placement certainly gives the court reason to question whether his needs and the State mandates can be furthered in that setting.
There is also the question of the perception of fairness in the eyes of this child. The court-placed children at Pleasant-ville have been accorded the full panoply of statutory rights as set forth in the respective articles of the Family Court Act. Sam has received none of these. This court has had occasion to deal with the realities of just that kind of situation in Matter of Andrew R. (115 Misc 2d 937).
The agency claims that whatever disparity of rights that may exist between voluntarily placed children and those adjudicated as persons in need of supervision and juvenile *74 delinquents is without significance since there is no stigma attached to a voluntarily placed child. But there is removal from home, potential placement in an institutional setting (as here), and potential commingling with adjudicated persons in need of supervision and juvenile delinquents (as here). It is not, as the agency suggests, merely concern over stigma that led to the evolution of the due process rights of accused juvenile, but rather this multifaceted impact on the life and liberty interests of the child (In re Gault, 387 US 1).
Accordingly, the matter is set down for a hearing on May 28, 1986, to determine whether the court should order conditions requiring the implementation of a specific plan of action by the agency to exercise diligent efforts towards the discharge of Sam from foster care. In furtherance thereof, the court will inquire into the suitability of Sam’s continued placement at Pleasantville Cottage School.